UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN THE MATTER OF LUHR BROTHERS, INC. AS OWNER OF BARGES L-1040, L-216, L-1061, L-325, AND L-326 PRAYING FOR EXONERATION FROM OR LIMITATION OF LIABILITY | CIVIL ACTION<br><br>NO: 05-1434 c/w<br>05-1897<br><br>SECTION: "J" (4) |

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

This matter was tried before the Court, sitting without a jury, on June 18-19, 2007. Having considered the testimony and evidence at trial, the arguments of counsel, and applicable law, the Court now issues the following Findings of Fact and Conclusions of Law in accordance with Federal Rule of Civil Procedure 52(a).

### FINDINGS OF FACT

1.   Luhr Bros., Inc. ("Luhr") operates a rock yard on the Red River near Alexandria, Louisiana. At the yard, rock product is unloaded from river barges and stockpiled for shipment to Luhr's customers.

2.   Although most of the barges brought to the yard are Luhr barges delivered by Luhr river towboats, occasionally a boat

not owned by Luhr will deliver barges to be unloaded for a common customer of Luhr.  This was the case on December 5, 2004, when the M/V JOHN C. TERRAL, a towboat owned by Terral RiverService, Inc., ("Terral"), arrived at Luhr's yard with six loaded rock barges.

    3.   Terral's boat captain, Russ Thornton, was familiar with the Luhr operation and knew to tie off his six barges at the specific location designated for that purpose by Luhr.  This tie-off location consisted of three mooring wires attached to trees and deadmen on the right descending bank of the River at the rockyard.  Thornton tied off Terral's six loaded barges at this location.

    4.   Around 6:00 a.m. on December 6, 2004 (when the Luhr yard opened), Luhr's tugboat, the M/V ALBOB, and its four barge rock tow tied off outside the six Terral barges that already were moored on the shore wires.

    5.   Shortly after 6:00 a.m. on December 6, 2004, Herbert Bruce, Luhr's operations manager, told Thornton to start selecting and moving the Terral barges down to the unloading dock, located on the right descending bank of the River.  Near 11:00 a.m. after two Terral barges had been unloaded and as Thornton was preparing to move the third Terral barge downriver, he communicated with Bruce about the four Luhr rock barges, which

had been tied off outside of the Terral barges, which Thornton said needed to be moved in order to move the remaining Terral barges to the unloading dock.

6.  There is a dispute regarding what the communication was between Thornton and Bruce.  Thornton testified that Bruce told him to move the four Luhr barges to Luhr's spud barge L982, which was spudded-down a short distance upriver from the location of Terral's loaded barges.  Luhr's deck barge L1040 was tied off on the river-side of the L982.  The L1040 was empty.  Bruce, on the other hand, claims that he told Thornton that he could move the four Luhr barges if he wanted; however, he needed to return the barges to the mooring wires on the bank when he was done.  Bruce denied giving orders for the Luhr barges to be moved to a specific location.

7.  Thornton moved the four Luhr barges upriver to the river-side of the L1040 that, in turn, was moored to the spud barge L982 whose spuds were positioned in the river bottom.

8.  Neither Thornton nor his deckhand Gerald Mayo inspected the mooring arrangements to determine whether they were secure enough to safely hold the four Luhr Barges in place.

9.  Captain Thornton admitted that he would not have moored the barges in that location if he had known that the L982 was

spudded down without shore wires.  He admitted that would have raised a "red flag" in his mind.

    10.  Captain Thornton admitted there were other places where the four loaded Luhr barges could have moored the barges, using either deadmen or trees along the river bank.

    11.  The unloading of Terral's barges stopped at 2:00 p.m. on December 6, 2004, as Luhr needed to utilize the unloading dock for the remainder of the afternoon to prepare the M/V VICKIE's tow for a northbound trip.  During this time, the M/V VICKIE's tow was moored outside of the remaining two loaded Terral barges on the shore wires as was the custom for preparing loaded tows at the yard.  By 6:30 p.m., the preparation of the M/V VICKIE's tow was near completion, and the M/V VICKIE departed the yard at 7:20 p.m.  As was its normal operating procedure, no Luhr employees remained in the yard that night and none bothered to check on the moorings of the Luhr barges, or attach lights to the barges that Terral had tied off to the L1040 and L982.  Mr. Bruce admitted that should have been done.  Although, the M/V JOHN C. TERRAL and its crew remained at the Luhr yard that night, no Terral employees bothered to check on Luhr's four loads or put lights on them before retiring for the night.

    12.  Thus, the four Luhr barges remained tied off to the L1040 and L982.  The Terral crew did not return the four Luhr

barges to their original moorings on the right bank of the River. The Luhr barges were not moved again prior to the breakaway early the following morning.[1]

13. Thornton did not instruct any crew member to stand watch after midnight. His entire crew was asleep at the time of the breakaway.

14. The testimony of Terral corporate witnesses exhibited a cavalier attitude towards safety aboard its vessels. Terral seemed unconcerned about what its captains did, how safety measures were instilled, or how safety aboard its vessels was promoted.

15. A Responsible Carrier Program ("RCP") manual (a safety manual) was aboard the JOHN C. TERRAL at the time the incident occurred, which required a crew member to be on watch at all times.

16. Although the RCP had been aboard the JOHN C. TERRAL for over a year at the time the breakaway occurred, John A. Martin, Terral's Marine Superintendent, admitted that Terral had never required its captains or employees to read it.  Simply because Terral was not officially certified by the American Waterway

---

[1] During trial Thornton's deckhand, Gerald Mayo attempted to tell the Court that the 1040, the flat deck barge, had been removed by Luhr after it was moored there by Terral.  The Court finds this testimony totally incredible and unbelievable.

Operators ("AWO"), and simply because the RCP manual was not officially in effect at the time of the breakaway, there was no reason for Terral's captains and employees to not yet be familiar with and following the manual.  As explained by Fred Budwine, the certified auditor who audited Terral's RCP manual, the manual was nothing more than a codification of existing industry standards, customs and long-standing best practices in the industry, which took 10 years to create.  The RCP manual was simply an amalgamation or consensus of the industry association as a whole.

    17.  In the early morning hours of December 7, 2004, while the entire crew of the JOHN C. TERRAL slept, the four Luhr barges that were added to the L982 broke away as a unit, and the L1040 broke away as a single unit.  The five barges drifted downriver past the M/V JOHN C. TERRAL.  Sometime after 3:00 a.m. on December 7, 2004, the L1040 struck the John H. Overton Lock and Dam No. 2, followed shortly thereafter by the four loaded Luhr barges.

    18.  The preponderance of the evidence clearly shows that the L982 was spudded down prior to the casualty, but not secured by any shore wires.  Terral argued that the upriver spud was locked down, thereby causing it to pull loose from the river bottom as the river level rose, resulting in the breakaway.  However, the evidence clearly shows that the spud was not locked

down at the time the breakaway occurred.  Thus, Terral's "locked spud defense" has no merit.  First, it is unclear to the Court when the photographs showing one spud higher up in the air than the other spud were taken. Neither side proved to the Court what, if anything, had been moved or changed from the time of the breakaway until those photographs were taken. Second, the testimony was that the spud was not all the way up in the air, which means it was not locked by the manual chocks.  Thus, the only way that spud was being held in position was because someone was operating the engine in the spud shed to generate air pressure and pneumatic power to hold that spud up in the air.  It is clear to the Court that whenever those photographs were taken, it was being held in the air by pneumatic air pressure, which infers that someone was in the shed applying the brake. It is equally clear to the Court that no one was in the shed applying the pneumatic brakes in the early morning hours of December 7, 2004 when the breakaway occurred.  Last, of all the witnesses who testified that saw the spud barge that day up until the time the Luhr crew went off duty and the Terral crew went to bed on its boat, no one testified that they saw one spud higher than the other spud, which the Court finds would have set off a red flag.

## CONCLUSIONS OF LAW

1.   Jurisdiction is proper under the admiralty and maritime jurisdiction of this Court, 28 U.S.C. 1333.  Venue is proper in the Eastern District of Louisiana where Luhr Bros., Inc. initiated its limitation action in accordance with Rule F, Supplemental Rules For Certain Admiralty and Maritime Claims, FRCP.

2.   The remaining parties, Terral and Luhr, jointly funded a settlement of the claims by the federal government for damages to its dam and lock, and by adjacent downriver property owners for flood damages to their properties.  The Court must determine or apportion liability for the breakaway between Luhr and Terral.

3.   Terral was negligent because it moored the four loaded Luhr rock barges to the spud barge and flat deck barge without checking to make certain that it was a safe place to moor the barges.  The Court does not agree that Terral should be absolved from fault simply because Luhr knew its barges had been moored in that location.  The Court finds that any vessel towing and mooring barges in a fleet has its own independent obligation or duty to see that the place and the way it is being moored is safe and secure.  Ordinarily a contract for the movement of a barge by a towboat is a contract of towage.  <u>See Southwestern Sugar and Molasses Co. v. River Terminals Corp.</u>, 360 U.S. 411, 418 n.6, 79 S.Ct. 1210, 1215 n.6, 3 L.Ed.2d 1334, 1341 n.6 (1959); <u>Nat G.</u>

Harrison Overseas Corp. v. American Tug Titan, 516 F.2d 89, 94 (5th Cir. 1974), as modified, 520 F.2d 1104 (5th Cir. 1975); Humble Oil & Refining Co. v. Tug Crochet, 422 F.2d 602, 606 (5th Cir. 1970); First Mississippi Corp. v. Fielder Towing Co., 469 F.Supp. 1080, 1084 (N.D. Miss. 1979).  When Terral undertook to move the four Luhr barges and remoor the barges at another location on the River, a contract of towage was created between Luhr and Terral.  Agrico Chem. Co. v. M/V BEN W. MARTIN, 664 F.2d 85, 90 (5th Cir. 1981), reh'g denied, 669 F.2d 733 (5th Cir. 1982).

    4.   When Terral performed the towage, it became obligated to exercise reasonable care in the performance of the movement and remooring of the four Luhr barges.  Land v. M/V VALLEY VOYAGER, 284 F.Supp. 297, 303 (E.D. La. 1968); aff. 408 F.2d 1354 (5th Cir. 1969) and cases cited.  See also Parks, Law of Tow and Pilotage, 3rd Ed., pp.122-123 (duties of a gratuitous tower).  This obligation of Terral required that the four Luhr barges be moored properly and in a safe location.  A tug that removes a barge from a fleeting area, moving other barges in the process, is bound to ensure that remaining barges are properly secured and that all mooring lines affected by the movement are proper and fast.  Lower River Ship Services, Inc. v. Casteel, Inc., 1991 WL 13867 (E.D.La. 199); Dow Chem. Co. v. Barge UM-23B, 287 F.Supp.

661 (E.D.La. 1968), aff'd, 424 F.2d 307 (5th Cir. 1970); <u>Federal Barge Lines, Inc. v. Star Towing Co.</u>, 263 F.Supp. 981 (E.D.La. 1967); <u>Martin Oil Service, Inc. v. John I. Hay Company</u>, 219 F.2d 237 (5th Cir. 1955).

5.   Terral was also negligent in not having its employees and captains follow the provisions of the RCP manual which required someone to be on watch on the JOHN C. TERRAL at the time of the breakaway.  Even though the RCP manual was technically not in effect at the time of the breakaway, it was simply a codification of existing industry standards, customs and best practices. Violations of industry standards in and of themselves can be evidence of negligence.

6.   On the other hand, Luhr is certainly not without fault. It was Luhr's barges that broke away in the early morning hours of December 7, 2004. Luhr clearly would be presumed negligent and would be liable to the United States Government and the property owners who sustained damages downriver as a result of the barges breaking away and alliding with the dam.

7.   The Court finds that both Terral and Luhr were negligent in failing to place lights on the barges before nightfall.

8.   Both Terral and Luhr were negligent in terms of communicating with each other and with not getting their orders

and responsibilities straight between themselves.  Bruce expected Terral to take care of the barges by lighting them and returning them to their original mooring location from where they had been removed earlier that day, and Thornton expected Luhr to move the barges back to the shorelines.

   9.    Both Terral and Luhr should have checked with each other before the yard was shut down and before Terral's crew went off duty to determine what was going to be done and by whom with respect to those four barges.

   10.   The Court finds that there was negligence on both Luhr and Terral for the reasons stated above and for reasons orally stated on the record at the conclusion of the bench trial.  Terral's negligence is greater because Terral moored the barges in their location at the time of the breakaway.  The Court concludes that Terral is 65% responsible and Luhr is 35% responsible for the breakaway and the damages which resulted.

   11.   Terral is not entitled to limitation of liability because it failed to properly train and instruct its Captains and crew members with respect to the provisions of the RCP manual which was aboard its vessels, but not used by the crew.  See Trico Marine Assets Inc. v. Diamond B Marine, 332 F.3d 779 (5th Cir. 2003).  If proper lights had been placed on the Luhr barges and there had been someone on watch in the wheelhouse of the

Terral vessel at the time of the breakaway, it is likely that the barges would have been observed as they floated past Terral's vessel, allowing Terral to prevent the allision with the dam and locks which occurred 11 miles downriver.

New Orleans, Louisiana this 12th day of July, 2007.

*[signature]*

CARL J. BARBIER
UNITED STATES DISTRICT JUDGE